# In the
# Indiana Supreme Court

IN RE PILOT PROJECT     )
FOR ELECTRONIC NEWS COVERAGE )  Supreme Court Case No.
IN INDIANA TRIAL COURTS    )  94S00-0605-MS-166

## ORDER

Notwithstanding the prohibitions against broadcasting, televising, recording, or taking photographs in the courtroom or and adjacent areas in the Code of Judicial Conduct Canon 3B(12), the Supreme Court, following discussions initiated by the Indiana Broadcasters Association, in conjunction with the Hoosier State Press Association, will authorize a limited pilot project for video and audio coverage, still news photography, and radio news coverage, of proceedings in certain Indiana trial courtrooms, under the following terms:

1. **Term.** July 1, 2006-December 31, 2007.

2. **Consent.** Coverage by camera and/or recorder as provided in this order may not be permitted except upon the written consent of the trial judges and the parties involved.

3. **Scope.** All civil and criminal proceedings will be eligible for camera and recorder coverage by the news media, except for proceedings not open to the public, either by state statute or Indiana Supreme Court rules. Additionally, the presiding judge shall have the authority to interrupt or prohibit the coverage of any part of a trial or proceeding if he or she deems such stoppage appropriate to meet the ends of justice.

4. **Prohibitions Regarding Coverage.** The presiding judge shall prohibit the filming and audio recording of the following:
    a. Police informants;
    b. Undercover agents;
    c. Minors;
    d. Victims of sexual abuse, assault, or other sex-related offenses;
    e. For the purposes of this pilot project, a trial judge shall prohibit all camera and audio recording, taping, or broadcast of a juror or jurors in the courthouse.
    f. Witnesses at sentencing hearings.
    g. The trial judge has the discretion to allow post-verdict audio and videotaping of juror interviews or press conferences, with the juror's or jurors' consent.

The presiding judge shall prohibit the audio recording of the following:

a. Parties and counsel engaged in attorney-client communications;
b. Counsel engaged in co-counsel communications:
c. Bench conferences.

5. **Cameras.** News cameras and audio equipment must not be intrusive of the judicial process. No more than one (1) video camera, one (1) still camera, and three (3) audio tape recorders are permitted in a courtroom during a trial. The still camera to be utilized is prohibited from using a flash or motorized film advancement. An existing audio system is to be used whenever adequate. Camera and recorder locations are to be set up only in areas designated by the presiding judge after consultation with the media. All cameras must be on tripods and produce no distracting sound.

6. **Media Personnel.** Media personnel themselves are to be non-intrusive to the judicial process. Personnel may enter and leave only prior to the commencement of proceedings, during recess, or after adjournment. Appropriate attire is required.

7. **Equipment.** Media equipment can be set up or removed only prior to the commencement of proceedings, during recess, or after adjournment. There are to be no distracting lights or sounds.

8. **Evaluation.** The project will be evaluated by the Supreme Court, in consultation with the Indiana Broadcasters Association and the Hoosier State Press Association as described in Exhibit A. All costs of the evaluation will be paid by the news media.

9. **Pool Coverage.** For each trial court involved in this pilot proposal, the media shall designate a coordinator whose responsibility shall be securing compliance with these provisions and coordinating a pooling arrangement. Specifics of the pool covered will be determined by the trial judge, in consultation with a representative from the Indiana Supreme Court. The media shall agree in advance of court proceedings as to the appropriate pooling arrangement. If the media cannot so agree, camera or audio recording coverage shall not be permitted. The purpose of this provision is to eliminate the necessity of involving the presiding judge in the resolution of any such dispute.

10. **Judges.** The following judges have given their consent to participate in a Supreme Court approved pilot project that would permit news cameras and recorders in their courtroom and thus are offered as appropriate candidates for purposes of presiding over court proceedings during the time of this Pilot Project:

| | | | |
|---|---|---|---|
| 1. | Allen Superior Court | Nancy E. Boyer | 260.449.7634 |
| 2. | Warrick Superior Court | Robert R. Aylsworth | 812.897.6213 |
| 3. | Delaware Circuit Court | Robert Barnett, Jr. | 765.747.7782 |
| 4. | Marion Superior Court Criminal Division #2 | Robert R. Altice | 317.327.4996 |
| 5. | Marion Superior Court | Patricia J. Gifford | 317.327.4524 |

Criminal Division #4

6. Montgomery Circuit Court     Thomas K. Milligan    765.364.6450
7. St. Joseph Circuit Court      Michael G. Gotsch    574.235.9551
8. Vanderburgh Superior Court   Wayne Trockman     812.435.5407

The Clerk is directed to send copies of this order to the trial judges listed in paragraph 10; to Daniel P. Byron, Bingham & McHale, 2700 Market Tower, 10 West Market Street, Indianapolis, IN 46204; to Stephen Key, Hoosier State Press Association, One Virginia Avenue, Suite 701, Indianapolis, IN 46204; to Chief Judge Kirsch, Indiana Court of Appeals.

Done at Indianapolis, Indiana, this 9th day of May, 2006.

/s/     Randall T. Shepard
Chief Justice of Indiana

Shepard, C.J., and Sullivan and Boehm, JJ., concur.
Dickson, J., dissents with opinion, in which Rucker, J., joins.

# EVALUATION REPORT
# FOR CAMERAS AND RECORDERS IN INDIANA TRIAL
# COURTROOMS

Within 90 days following the completion of the pilot project for camera and audio coverage of proceedings in certain Indiana trial courtrooms, the Indiana Broadcasters Association and Hoosier State Press Association will provide a comprehensive evaluation report to the Indiana Supreme Court that will summarize the impressions of the judges, attorneys, jurors, and media pool coordinators who were directly involved in the trial court cases under the pilot project. The written report will include a composite summary of media coverage, available to HSPA and IBA, published or broadcast during the experiment; a summary of all comments received from the above-designated trial participants; an account of problems or benefits perceived with coverage of the trial courtrooms involved in the experiment; and recommendations, if any, concerning the possibility of continuing camera and audio recorder coverage of Indiana trial court. Interim reports will also be compiled and submitted upon request by the Court.

## SURVEY OF PARTICIPANTS

As a part of this evaluation process, the associations will prepare an appropriate and simple form to be distributed to those persons involved in the evaluation. The form will be completed by the participant upon the termination of each trial court proceeding involved in the experiment. Questions will explore issues such as:

- Did the presence of cameras and recorders impact on the judges' and attorneys' preparation or presentation?

- Did the presence of cameras and recorders appear to affect witnesses' testimony?

- Did the presence of cameras and recorders disrupt the attention of jurors from the case?

- For jurors – to what extent, if any, were you affected by the camera or audio recording of the proceedings, and in your opinion was any other participant (judge, attorneys, witnesses, or jurors) affected by such recordings. Explain.

The content of the form will be prepared by the two associations within 30 days of the Indiana Supreme Court's approval of the project, and will be submitted to the Court for its review and approval.

# SCIENTIFIC SURVEY BY PROFESSIONAL RESEARCH GROUP

Additionally, to assist in determining the impact on the public's perception of the judicial system, the Associations will hire a professional research company or companies to conduct a focus group and survey in two geographic areas, one in and around Indianapolis and also one in some other part of the State.

To explore the connection between trial coverage and in-depth issue reporting, HSPA and IBA will survey its members to determine whether in-depth coverage of societal issues was sparked or enhanced by the media's ability to record or photograph trial proceedings.

A professional research company will be responsible for selecting a focus group comprised of 15 to 25 or so persons or ordinary citizenry, *i.e.* the public. Only those persons who have viewed or read a substantial part of a trial shall be selected for a focus group. The research group will be responsible for selecting the persons for a group, running the focus groups, putting together their conclusions, and compiling an appropriate report. The report will then be submitted directly to the Indiana Supreme Court with copies to the involved Judges and the Associations. A 90-day period of time following the conclusion of the broadcasted trial is an appropriate time for the compiling, producing, and submitting of the report.

Other or alternative evaluation methods may be suggested by the Indiana Supreme Court. The IBA and HSPA will strive to create a process that allows the Supreme Court to fairly and thoroughly to evaluate the project.

# In the
# Indiana Supreme Court

IN RE PILOT PROJECT            )
FOR ELECTRONIC NEWS COVERAGE  )        Supreme Court No.
IN INDIANA TRIAL COURTS          )        94S00-0605-MS-166

---

**Dickson, Justice**, **dissenting.**

I respectfully dissent from the Court's decision today granting a request from the Indiana Broadcasters Association ("IBA") and the Hoosier State Press Association ("HSPA") for permission to conduct an experimental pilot program that permits televising Indiana trial court proceedings otherwise prohibited by Indiana Code of Judicial Conduct Canon 3(B)(13).[1]

Indiana's long-standing policy of protecting trial courtroom proceedings from risks posed by television coverage is supported by sound policies to maximize the effectiveness, reliability, and fairness of judicial proceedings. If the IBA and HSPA wish to compile data to support their desire to seek modification or elimination of Canon 3(B)(13), they should examine the several jurisdictions presently permitting television cameras for data-collection and analysis, without posing a risk of unfair trials for the Indiana citizens during a pilot project. Furthermore, the pilot project does not appear to

---

[1] Indiana Code of Judicial Conduct Canon 3(B)(13) states:

A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:

(a) the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record, or for other purposes of judicial administration;

(b) the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings;

(c) the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions:
(i) the means of recording will not distract participants or impair the dignity of the proceedings;
(ii) the parties have consented, and the consent to being depicted or recorded has been obtained from each witness appearing in the recording and reproduction;
(iii) the reproduction will not be exhibited until after the proceeding has been concluded and all direct appeals have been exhausted; and
(iv) the reproduction will be exhibited only for instructional purposes in educational institutions.

be calculated to lead to definitive and reliable information to address and dispel, if possible, the most significant harms posed by trial court television coverage—its actual impact upon witnesses, parties, jurors, lawyers, and judges, and the resulting damage to the search for truth and justice. Nor is there any assurance that the pilot project will ascertain whether permitting televised court proceedings actually results in accurate public education rather than misinforming viewers as to the realities and operations of our trial courts.

Indiana judges have been required generally to prohibit television coverage of trial court proceedings since January 1, 1975, when the present provision was included as Canon 3(A)(7) of the predecessor Indiana Code of Judicial Conduct.[2] While media representatives have made several comprehensive proposals requesting elimination or modifications of our general policy, we have, after careful consideration, consistently declined these requests—until today.

In 1987, a group of news organizations[3] petitioned the Court for an amendment of the Code of Judicial Conduct or for permission to conduct an experimental pilot project, which this Court denied because we "[did] not perceive that the experiment would lead to the production of new, useful information, as there are many experiments being conducted in other states and that data is available."[4] In 1992, we declined a similar request, advising that we "continue to be interested in receiving information on the results in other states and in the federal system."[5] We likewise considered and declined another such request in 1997 presented on behalf of a coalition of media interests.[6]

If television coverage can safely be done in our trial courtrooms, without harm to the effective ascertainment of truth, the reliability and fairness of trials, the quest for justice, and the provision of correct information to the public, such safety should be first conclusively demonstrated by a thorough and reliable scientific study in jurisdictions in which trial court television is presently permitted, without putting Indiana citizens at risk.

---

[2] This prohibition was relocated to Canon 3(B)(13) in 1993.

[3] This request was made on behalf of the Hoosier State Press Association, the Indiana Associated Press Broadcasters Association, the Indiana Associated Press Managing Editors Association, the Indiana Broadcasters Association, the Indiana News Photographers Association, the Cardinal State, Michiana, and Indianapolis chapters of the Society of Professional Journalists-Sigma Delta Chi, the Women's Press Club of Indiana, and the Radio-Television News Directors Association.

[4] Letter from Chief Justice Randall T. Shepard to Ms. Jan Carroll, Barnes & Thornburg (Dec. 8, 1987).

[5] Letter from Chief Justice Randall T. Shepard to Mr. Robert P. Johnstone and Ms. Jan Carroll, Barnes & Thornburg (June 4, 1992).

[6] This request was present on behalf of the Society of Professional Journalists, the Radio/Television News Directors Association, the National Press Photographers Association, Indianapolis Newspapers, Inc., WISH-TV, Channel 8, the Richmond Palladium-Item, the Indianapolis Association of Black Journalists, of Indiana, the Hoosier State Press Association, the Indiana Associated Press Managing Editors Association, the Indiana Broadcasters Association, the Indiana Press Photographers Association, the Chicago Headline Club, and the Illinois News Broadcasters Association.

As of July 2005, Indiana is one of sixteen states that disallows broadcasts of trial court proceedings or has coverage rules so restrictive that they essentially prohibit such coverage.[7] Thus nearly one-third of the states have established policies largely disallowing cameras in courtrooms. In addition, television coverage is prohibited in all of our nation's federal trial courts. On the other hand, trial court television coverage is generally permitted in thirty-four states,[8] providing ample opportunities from which proponents for a change in the Indiana policy can gather and present data and analysis, if any, to support their request without jeopardizing fair and effective trials in Indiana courtrooms until it is first proven that it can be done with complete safety.

Our historical reluctance to permit television cameras in trial courtrooms results from experience and common sense. It is rare for most people ever to be in a courtroom, for any purpose. For those who do, whether as a party, a witness, or a juror, it will likely be a once in a lifetime experience. Becoming acclimated to unfamiliar courtroom proceedings and environment can be a daunting challenge. When we add to this burden by subjecting trial participants to television coverage, we significantly jeopardize their ability to fully concentrate and participate in trial proceedings, and endanger the reliability and fairness of our trials.

Common experience informs us that many people react strongly to the possibility of being televised, particularly those unaccustomed thereto. People are often aware of television cameras, distracted by them, and concerned about whether they are "on camera" and how they will appear on television. The possibility of being televised to neighbors and others can be embarrassing or frightening to some, and alluring and captivating to others. The public broadcast of personal or unpleasant information is often a risk to be avoided at all costs. Others are fascinated or energized by the possibility of appearing on television, and will engage in a variety of antics to get camera attention. Still others see the chance to appear on television as an opportunity to further their business interests or personal prestige. These facts we know from personal experience.

---

[7] Radio-Television News Directors Association & Foundation, *Cameras in the Court: A State-By-State Guide*, http://www.rtnda.org/foi/scc.html (last visited Apr. 28, 2006). The Radio-Television News Directors Association & Foundation maintains a state-by-state guide of policies regarding cameras in courtrooms. The organization categorizes states by tiers ranging from Tier I: the most allowed coverage to Tier III: the greatest restrictions on coverage. Indiana belongs to the third tier, along with fifteen other states: Alabama, Arkansas, Delaware, Illinois, Louisiana, Maine, Maryland, Minnesota, Mississippi, Nebraska, New York, Oklahoma, Pennsylvania, South Dakota, and Utah. Not included in the categorization among the tiers is the District of Columbia, but it prohibits trial and appellate court coverage by camera and audio recording altogether.

[8] Nineteen states allow broad discretion to the presiding judge: California, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Montana, Nevada, New Hampshire, New Mexico, North Dakota, South Carolina, Tennessee, Vermont, Washington, West Virginia, Wisconsin, and Wyoming. Fifteen states have restrictions regarding certain types of cases or witnesses upon their objection: Alaska, Arizona, Connecticut, Hawaii, Iowa, Kansas, Massachusetts, Missouri, North Carolina, New Jersey, Ohio, Oregon, Rhode Island, Texas, and Virginia.

The conduct of fair trials requires just the opposite behavior. We want participants who will give their full attention to the courtroom proceedings; witnesses who will be open, candid, fully forthcoming, and truthful; jurors who can without preoccupation be completely attentive to testimony and evidence; people who will not seek to avoid service as jurors or witnesses; and lawyers fully focused upon serving their clients and the courts, without the potential distraction of how their television appearance might affect the marketing of their law practice. It is easy to appreciate the historical prohibition of cameras in our trial courtrooms.

These anecdotal observations have been confirmed in a massive three-year experiment conducted in the federal courts. In 1990, the Judicial Conference of the United States approved an experiment to be conducted in a selection of federal appellate and trial courts, allowing cameras in courtrooms for civil cases for three years. The Federal Judicial Center ("FJC") evaluated the program and reported the results to the Judicial Conference. At the close of the experiment, and after analysis of the data collected, the Judicial Conference voted against its resumption. Describing this decision to Congress, federal Third Circuit Court of Appeals Chief Judge Edward R. Becker, on behalf of the Judicial Conference, explained:

> The Judicial Conference in its role as the policy-making body for the federal judiciary has consistently expressed the view that camera coverage can do irreparable harm to a citizen's right to a fair and impartial trial. We believe that the intimidating effect of cameras on litigants, witnesses, and jurors has a profoundly negative impact on the trial process. Moreover, in civil cases cameras can intimidate civil defendants who, regardless of the merits of their case, might prefer to settle rather than risk damaging accusations in a televised trial. Cameras can also create security concerns in the federal courts. Finally, cameras can create privacy concerns for countless numbers of persons, many of whom are not even parties to the case, but about whom very personal information may be revealed at trial.[9]

Judge Becker concluded:

> [T]his is a decision about how individual Americans—whether they are plaintiffs, defendants, witnesses, or jurors—are treated by the federal judicial process. It is the fundamental duty of the federal judiciary to ensure that every citizen receives his or her constitutionally guaranteed right to a fair trial. For the reasons discussed in this statement, the Judicial Conference believes that the use of cameras in the courtroom could seriously jeopardize that right. . . . As the Supreme Court stated in *Estes* [*v. Texas*, 381 U.S. 532 (1965)], "[w]e have always

---

[9] Cameras and Electronic Media in Courtroom: Hearing on S. 721 Before the Senate Judiciary Subcommittee on Administrative Oversight and the Courts, 106th Cong. (Sept. 6, 2000) (statement of Chief Judge Edward R. Becker on Behalf of the Judicial Conference of the United States), available at Statement of Chief Judge Edward R. Becker on Behalf of the Judicial Conference of the United States, 1-2, http://www.uscourts.gov/Press_Releases/becker.pdf [hereinafter Statement of Chief Judge Becker]; see also 146 CONG. REC. S8948 (Sept. 21, 2000).

held that the atmosphere essential to the preservation of a fair trial—the most fundamental of
all freedoms—must be maintained at all costs." 381 U.S. at 540.[10]

The study confirmed that the presence of cameras negatively affected witnesses, causing distraction, nervousness, distortion or modification of testimony, fear of harm, and reluctance to testify.[11]  In fact, between forty-six and sixty-four percent of judges responding to surveys, and thirty-two to forty percent of responding attorneys, identified some measurable negative effects on witnesses, including violations of their privacy, reluctance shown by them to appear in court, distractions, and increased nervousness.[12]

In addition to the probable negative impact upon witnesses, the federal study confirmed that television coverage adversely affects jurors as well.  Although the pilot program approved today by this Court includes provisions that prohibit or limit jurors from being televised, this does not alleviate the concerns identified in the federal study. The FJC identified four possible effects from cameras on juries: distraction, effect on deliberations or outcome, unnecessary emphasis on particular portions of the proceedings or certain witnesses, and reluctance shown by people to serve as jurors.[13]

Regarding these negative effects on jurors, the FJC reported that the majority of jurors responding to its surveys said they felt them only up to a slight extent.[14]  In contrast to the juror self-reporting surveys, the FJC study revealed that thirty-seven percent of responding judges believed that the cameras, at least to some extent, signaled to jurors that a particular witness or argument was especially important, and seventeen percent of these judges believed there to be at least some chance that people seeing the media coverage might try to influence friends on the jury.[15]  Responses from attorneys showed that nearly one in five believed that the cameras distracted jurors.[16]

The federal court study also provides evidence that televising trial proceedings has the effect of influencing the attorney's tone and the goal of his or her performance.[17] The FJC evaluation reported twenty-seven percent of the responding attorneys as saying that electronic media in the courtroom was distracting.[18]

---

[10] Statement of Chief Judge Becker, *supra* note 9, at 21-22.

[11] Federal Judicial Center, ELECTRONIC MEDIA COVERAGE OF FEDERAL CIVIL PROCEEDINGS 39-40 (1994), http://www.fjc.gov/public/pdf.nsf/lookup/elecmediacov.pdf/$File/elecmediacov.pdf [hereinafter FJC, MEDIA COVERAGE].

[12] *Id*. at 14, 20.

[13] *Id.* at 40-41.

[14] *Id.* at 42.

[15] *Id.* at 14.

[16] *Id.* at 20.

[17] According to the FJC study, twenty-one percent of attorneys surveyed believed that cameras tended to cause attorneys to be more theatrical in their presentations.  FJC, MEDIA COVERAGE at 20.

[18] FJC, MEDIA COVERAGE, *supra* note 11, at 21.

Televised coverage of courtroom proceedings is also potentially harmful because it tends to impact advocacy strategies and divert attention to the so-called "court of public opinion," which has been spawned from saturated media coverage of high stakes or sensational litigation.[19] The Washington Business Journal recently observed:

> When U.S. Supreme Court Justice Oliver Wendell Holmes stated in 1907 that "conclusions to be reached in a case will be induced only by evidence and argument in open courts and not by outside influence, whether private talk or public print," he could not have predicted America's new national obsession: the courtroom drama relayed through broadcast, Internet and print media.
> \*\*\*
> The pressure from the media can be quite intense on the defense. All too often companies are left scrambling to respond to claims, dealing with the emotional reaction to the news, and missing reporter deadlines.
>
> In a world when "no comment" equates to guilt, this could have a tragic effect on the bottom line via a deteriorating public image. As a result, many companies are opting to settle the most frivolous of cases out of court rather than face the public scrutiny.[20]

Effective representation of clients in the "court of public opinion" often imposes new demands upon attorneys to alter litigation strategies,[21] and to become knowledgeable and skillful in dealing with the workings of the media: "deadlines, soundbites and how to address tough questions."[22] Even in the absence of televised trial proceedings, such techniques may already be important in rare cases. But with the intrusion of television cameras in our courtrooms, an emphasis on such media-awareness and public relations skills will likely become a part of the regular routine for many lawyers, resulting in an impairment of public confidence that trials are fair and impartial and that resulting justice is based solely on evidence presented in court to disinterested fact-finders.

In spite of the significant detrimental effects of television cameras in our courtrooms, proponents still advocate their use often based on claims of educational benefits that such coverage provides for the public. But contrary evidence tends to show that the realities of commercial television coverage of trials do not necessarily coincide with accurate and fair portrayal of trial proceedings, and that the purported educational benefit to the public from television coverage is in fact quite illusory. Instead of

---

[19] *See, e.g.*, James F. Haggerty, IN THE COURT OF PUBLIC OPINION: WINNING YOUR CASE WITH PUBLIC RELATIONS (2003); Bickel & Brewer, *In-House Public Relations Group*, http://www.bickelbrewer.com/75.html (last visited Mar. 7, 2006).

[20] Nicole Quigley and Sheila Turner, *For Some Cases, the 'Jury' Isn't Just in the Courtroom*, WASHINGTON BUS. J., June 7, 2002, at 39.

[21] *See, e.g.*, The Kearney Law Firm, *Practice Area: High Profile Cases*, http://www.kearneylawfirm.com/Practice Areas/PracticeAreaDescriptionsHighProfileCases.asp (last visited Mar. 7, 2006).

[22] Quigley and Turner, *supra* note 20, at 39.

informative comprehensive trial coverage, the public instead has been more likely subjected to either short video clips of the rare dramatic, emotional, confrontive, or otherwise sensational courtroom moments; or courtroom scenes used as a video background for announcer voice-over commentary.

In its study, the FJC analyzed ninety news stories covering federal cases taking place in courts participating in the federal pilot program. The average time of footage per story was fifty-six seconds, and on average, reporters narrated sixty-three percent of all courtroom footage.[23] The report concluded that:

> [T]he stories did not provide a high level of detail about the legal process in the cases covered. In addition, the analysis revealed that increasing the proportion of courtroom footage used in a story did not significantly increase the information given about the legal process.[24]

Rather than providing meaningful coverage of trial proceedings, it thus appears that commercial television coverage of trials contributes relatively little to accurate public education but instead tends to present incomplete and misleading information regarding what occurs in our courtrooms, and may well significantly contribute to or amplify false public expectations for aggressive and confrontive lawyer techniques, an especially worrisome negative consequence of courtroom television.

University of Cincinnati law professor Christo Lassiter argues that there is no certainty that such audiovisual information actually has significant educational value, explaining that "[e]xperienced legal educators know that high profile cases are of mixed pedagogical worth: they excite student interest, but the student fixates on the political lure of the trial and not the legal issue implicated in the discussion."[25] According to a study conducted by the American Bar Association in 1998, even the public at large considered "all forms of media or entertainment" to be "the least important information sources" on the justice system and considered personal experience, schools, and libraries to be the most important sources of information.[26] The most likely accomplishment of the short clips provided to the public by the media is to increase the sensationalism of already sensational stories, rather than to educate people about the judicial process.

In one of the states prohibiting television cameras, New York, the state legislature had temporarily permitted broadcast coverage in certain courtrooms four separate times during a ten-year period ending in 1997.[27] But the legislature, notwithstanding the

---

[23] FJC, MEDIA COVERAGE, *supra* note 11, at 34.

[24] FJC, MEDIA COVERAGE, *supra* note 11, at 36.

[25] Christo Lassiter, *The Appearance of Justice: TV or Not TV—That Is the Question*, 86 J. CRIM. L. 928, 973 (1996).

[26] *Symposium: American Bar Association Report on Perceptions of the U.S. Justice System*, 62 AL. L. REV. 1307, 1314-15 (1999).

[27] *See* <u>Courtroom Television Network LLC v. State</u>, 833 N.E.2d 1197, 1203-04 (N.Y. 2005). New York Judiciary Law § 218 permitted the state's Chief Judge to authorize a program allowing trial judges discretion to permit audiovisual coverage of court proceedings with some

recommendations of a specially appointed commission, allowed the enabling legislation to expire.[28]  Evidence before the state legislature regarding the undermining of the independent integrity and dignity of the judicial process, the negative effects on trial participants, and the questionable benefits afforded by cameras to public education, appears to have outweighed conflicting evidence of positive educational benefits, a measurable contribution to desirable open government, and some positive impacts on trial participants.[29]

I further oppose the Court's action today to authorize television in Indiana courtrooms because there is a complete absence of any true public demand for televised access to courtroom proceedings.  The lack of public clamor requesting cameras in courts is exemplified by polls indicating an overwhelming opinion that cameras be kept out of our trial courtrooms.[30]

Because television coverage presents significant risks, some inherently obvious and others recognized by various authorities, it would seem imperative that proponents seeking to change our rule against television trial coverage should be required first to demonstrate conclusively that these risks are in fact non-existent or can be alleviated. Second, because several other jurisdictions now permit television coverage of trials, it is from those jurisdictions, not Indiana where such coverage is prohibited, that the proponents should gather information to establish, if it is possible, support for their proposed changes.

Surprisingly, the "Evaluation" component of the pilot program, which is prescribed in Exhibit A to the order of approval, calls for a "scientific survey" that entails the HSPA and IBA hiring a "professional research company" to explore the "impact upon the public's perception of the judicial system," primarily based upon a survey of HSPA and IBA members, "to determine whether in-depth coverage of societal issues was sparked or enhanced by the media's ability to record or photograph trial proceedings." These subjects of the "study" are overwhelmingly proponents of courtroom cameras, and

restrictions.  The statute also provided for a committee for the purposes of reviewing the coverage and evaluating the effectiveness of the program, whether it benefited the public, and whether any abuses had occurred.  In 1997, the state legislature allowed Judiciary Law § 218 to expire, which reinstated Civil Rights Law § 52, banning all audiovisual coverage in most courtroom proceedings.  This case represented an unsuccessful constitutional free speech challenge of § 52 by Court TV.

[28] *Id*. at 1204; *see also* Jay C. Carlisle, *An Open Courtroom: Should Cameras Be Permitted in New York State Courts?*, 18 PACE L. REV. 297, 302 (1998).

[29] *See* Carlisle, *supra* note 28, at 303-05.

[30] Two polls conducted in relation to high profile cases both indicate that eighty percent of respondents thought it was better that cameras were not allowed in the courtroom.  *See* Gary Fields, *Many Say a Fair Trial Possible in Okla. Case*, USA TODAY, Mar. 28, 1997, at 3A; Princeton Survey Research Associates, *The Verdict II:  The Simpson Civil Trial*, February 8, 1997 (noted in Interview by Margot Adler with Judge Edward Becker, U.S. Court of Appeals for the Third Circuit, and Barbara Cochran, president of the Radio-Television News Directors Association & Foundation, aired on *Justice Talking*, *available at* http://www.justicetalking.org/viewprogram.asp?progID=434).

the designated investigation fails to call for any evaluation of the adequacy of any resulting public education or the frequency with which misleading, incomplete, and distorted information may result.

It is most disappointing that neither the pilot project authorization order, nor the specifications of Exhibit A, affirmatively require the development of reliable information utilizing behavioral science to seek objective evidence of whether, and to what extent, trial participants may in fact be affected by the presence of television cameras. The evaluation prescribed in Exhibit A includes a survey merely seeking trial participants' personal opinions regarding the impact of cameras upon preparation and presentations of judges and attorneys, upon witness testimony, upon juror distraction, and other observed effects. Proponents of courtroom television often seek to minimize objections by presenting surveys of trial participants who not surprisingly often disclaim any harmful effect from television cameras. But the assertion by a former trial participant that he or she was not distracted or affected by television must be viewed with skepticism because of the inherent self-interest and limited self-awareness of most participants, and their admirable inclination to respect and legitimatize the judicial process in which they have participated. Even though of dubious value as evidence supporting the use of courtroom television, such participant surveys are the principal component of the approved pilot project.

To meet the most serious concern—the effect of courtroom television cameras on trial participants, the pilot project should not merely garner such subjective and anecdotal support, but rather should seek to compile credible objective data and engage in a reliable scientific exploration of the true effects of the presence of television cameras upon trial participants. I believe that the omission of such a truly scientific component from the pilot project is a fatal flaw. The final paragraph of Exhibit A expresses the willingness of the IBA and the HSPA to "create a process that allows the Court fairly and thoroughly to evaluate the project" and advises that "[o]ther or alternative evaluation methods may be suggested by the Supreme Court." Unfortunately, however, today's order authorizing the project fails to specifically require a reliable scientific study based on the objective behavior of trial participants.

My qualms about whether the pilot project will produce reliable information are enhanced because the project permits the IBA and the HSPA themselves to select and hire an "independent" research entity. This methodology invites suspicion in the event of any resulting findings favorable to the proponents. It would have been more assuring for this Court itself to select, employ, and direct the research entity, subject to full reimbursement of costs to the Court by the proponents.

For all of these reasons, I dissent from the Court's order granting the IBA/HSPA request for the camera pilot project, and I encourage the trial judges who are listed in paragraph 10 of the Court's approval order to reconsider whether to consent to and participate in the pilot project.

Rucker, J., concurs.

9